**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

         *Plaintiff-Appellee,*

v.

MARK E. PHILLIPS, a/k/a Mark L. Aaron,

         *Defendant-Appellant.*

No. 07-4230

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:05-cr-00165-JFM)

Argued: September 25, 2009

Decided: November 24, 2009

Before WILKINSON and DUNCAN, Circuit Judges,
and Damon J. KEITH, Senior Circuit Judge of the United
States Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Senior Judge Keith joined.

## COUNSEL

**ARGUED**: James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Joyce Kallam McDonald, OFFICE

OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Denise C. Barrett, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Appellant Mark Phillips was convicted, after a jury trial in the District of Maryland, of securities fraud, mail fraud, wire fraud, and access device fraud. He now appeals his conviction, arguing that the district court erred under the Fourth Amendment in denying his motion to suppress evidence seized pursuant to a search warrant. According to Phillips, the agents executing the search warrant exceeded the warrant's scope by seizing items not expressly named therein.

After careful consideration, we reject Phillips's claim. We hold that the warrant's inclusive language was reasonably read by the agents to encompass the seized evidence and that the agents' seizures were therefore permissible. Accordingly, we affirm the judgment.

I.

A.

In early 2003, the United States Postal Inspection Service began a fraud investigation of appellant Mark Phillips. The investigation revealed that over a period of approximately three years, Phillips had fraudulently applied for several credit cards, using his father's identity and declaring a false income. Phillips then used those fraudulent credit cards to make

expensive purchases. Among other items, Phillips bought several pieces of stereo, exercise, and computer equipment, collectible coins, a pool table, a telescope, and a samurai sword. Ultimately, Phillips accumulated hundreds of thousands of dollars of credit card bills and either did not attempt to pay those bills or attempted to pay with bad checks.

Investigators at the U.S. Postal Inspection Service also uncovered other fraud perpetrated by Phillips. For example, Phillips possessed two driver's licenses, each with his own photograph, address, and date of birth, but each with a different name: Mark Le Roy Aaron and Mark Edwards Phillips. Additionally, investigators learned that Phillips had opened an account for frequent gamblers at an Atlantic City casino using his father's social security number and had made over $28,000 in cash withdrawals on that account. A criminal search history revealed that Phillips had previously been arrested on state charges of theft by deception and issuing bad checks.

During the course of the investigation, postal inspection agents also became aware that Phillips was the "CEO and Founder" of a business called Phydea, which provided online financial stock reports. Some of Phillips's fraudulent purchases helped to fund Phydea. For example, he used a fraudulent credit card to pay Interland Web Hosting for the hosting and maintenance of his business's website, Phydea.com, and he used a fraudulent card to purchase advertisements for Phydea, which appeared in Investor's Business Daily. Also, Phillips frequently used Phydea's corporate name in connection with his credit card fraud. For instance, Phillips bought entertainment equipment with a fraudulent VISA card using the internet address Phydea.com; Phillips made a purchase on eBay using the e-mail address *phydea@earthlink.com*; Phillips fraudulently applied for an American Express card using the e-mail address *CEO@PHYDEA.com;* and when applying for the same American Express card, Phillips misstated his income as $1 million and misstated Phydea's annual revenue

as $10 million. Unbeknownst to the postal inspectors at the time, however, Phillips was using Phydea in connection with more than just credit card fraud; he was also using it and a related investment vehicle, Phydea Equity Fund, as part of an elaborate securities fraud scheme.

In July 2003, the U.S. Postal Inspection Service sought a search warrant for Phillips's Maryland residence. The magistrate judge approved the search warrant, finding probable cause for violations of access device fraud (18 U.S.C. § 1029), fraud in connection with identification documents (18 U.S.C. § 1028), and bank fraud (18 U.S.C. § 1344).

The search warrant and incorporated affidavit authorized the seizure of a wide range of items and documents. Specifically, Part I of Attachment A described items and services purchased using fraudulent credit cards. It contained a number of specific examples, "including but not limited to" "[p]ayments to Interland Web Hosting for the hosting of a webpage titled PHYDEA.com." Part II of Attachment A listed "[i]tems that relate to or constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1028, 1029 or 1344, as described in the Affidavit." Like Part I, Part II listed numerous examples "including but not limited to" the following relevant categories:

> Category A: Mail, books, records, receipts, notes, ledgers and other papers . . . relating to fraudulent conduct and financial crimes, including but not limited to those documents and records relating to payments to Interland Web Hosting for the hosting of a webpage titled PHYDEA.com.

> Category C: Books, records, receipts, bank statements and bank records . . . relating to fraudulent conduct and financial crimes.

>Category D: Checks, pass books, bank checks and any other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money.

>Category J: [C]redit cards, in any form and credit card account numbers, payment device and/or account numbers of any kind.

The affidavit also set forth additional details relating to Phillips's case and the evidence of his fraud.

Prior to executing the search warrant, Inspector Judy Starliper, the head of the investigation, thoroughly briefed all agents on the facts of Phillips's case. Her operations plan summarized the investigation and informed the agents that Phillips "has a webpage called PHYDEA.com and uses the same e-mail address to make his purchases." Each agent was provided a copy of Attachment A listing the items to be seized. During this briefing, another agent, Inspector David Reardon, informed the team that he had received a complaint from an aggrieved investor in Phydea Equity Fund, an entity related to Phydea, and therefore requested that the agents alert him if they saw anything relating to Phydea or Phydea Equity Fund during the search.

Immediately following the briefing, the U.S. Postal Inspection Service team executed the search warrant. During the search, Inspector Reardon himself identified several documents relating to Phydea and Phydea Equity Fund. He noted that these documents contained personal identifying information "which was in many regards what Inspector Starliper was looking for in an identity fraud situation" and potentially related to many of the fraudulent credit card purchases made using Phydea's name. To err on the side of caution, Inspector Reardon brought the documents to the attention of his superiors, and Inspector Starliper telephoned the United States Attorney's office to seek guidance on whether the Phydea and Phydea Equity Fund documents were seizable. After reading

the warrant and accompanying affidavit, the Assistant United States Attorney concluded that the warrant authorized their seizure.

In executing the warrant, the agents seized a number of documents and records that not only helped confirm the investigators' suspicions of credit card fraud but also revealed to the investigators for the first time the full extent of Phillips's securities law violations involving Phydea and Phydea Equity Fund. Among these seized documents and records are several categories of evidence that Phillips now contests: documents and records relating to Phydea, including invoices for the Phydea advertisements appearing in Investor's Business Daily; documents and records relating to Phydea Equity Fund, including the files of individual investors; and some of Phillips's own financial records, including his bank statements.

### B.

In April 2005, the United States charged Phillips with thirty-five counts of securities fraud (15 U.S.C. § 78j(b)), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and access device fraud (18 U.S.C. § 1029(a)(2)). A federal grand jury indicted Phillips on all counts. Prior to trial, Phillips filed a motion to suppress the evidence seized pursuant to the search warrant. He argued that the contested seizures fell outside the scope of the warrant, because the warrant did not explicitly mention those items.

Following a four-day evidentiary hearing, in which the district court heard testimony from a number of witnesses, the district court denied Phillips's motion to suppress. In reaching its decision, the district court made the following findings. First, it found that the seizure of Phydea-related documents was proper, because those documents were seized "in connection with the credit card investigation." In so finding, the court noted that Phillips had used several fraudulent credit cards to make purchases in connection with Phydea and that

Phillips had misstated Phydea's income on a fraudulent credit card application. Second, the district court held that the agents were justified in seizing documentation relating to Phydea Equity Fund, because at the time of the search, it was unnecessary to draw fine distinctions between the two entities of Phydea and Phydea Equity Fund. Third, the district court concluded that Phillips's personal financial records were seizable, because they were relevant to demonstrating his income, which he misstated on a fraudulent credit application. Significantly, the district court concluded that the seizing agents at all times throughout the search acted in "good faith" and "acted responsibly, reasonably and sensibly."

Following the district court's denial of Phillips's motion to suppress, the seized evidence was admitted, and Phillips was tried by a jury. Ultimately, Phillips was convicted on all counts and sentenced to 121 months in prison. Phillips now appeals his conviction, arguing that the district court erred in denying his motion to suppress.

## II.

In reviewing the denial of a motion to suppress, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Neely*, 564 F.3d 346, 349 (4th Cir. 2009).

## A.

Phillips makes a variety of claims, some of which appear to merge and overlap. Phillips contends that the postal inspectors' seizures exceeded the scope of the search warrant. The gist of his argument is that the warrant authorized the seizure of items on the basis of probable cause for criminal charges relating to credit card fraud and identity fraud. Therefore, Phillips claims, the seizure of items relating to securities fraud was not authorized by the terms of the warrant. This argument fails for reasons of both law and fact.

A search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization. *Walter v. United States*, 447 U.S. 649, 656 (1980) (plurality); *see also United States v. Squillacote*, 221 F.3d 542, 555 (4th Cir. 2000). However, a search warrant is not a "constitutional strait jacket." *United States v. Dornhofer*, 859 F.2d 1195, 1198 (4th Cir. 1988) (citation and internal quotations omitted). In interpreting search warrants, we must heed the Supreme Court's reminders to employ a "commonsense and realistic" approach, *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and avoid "'hypertechnical' scrutiny . . . lest police officers be encouraged to forgo the warrant application process altogether." *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). These fundamental legal principles apply not only to determining the validity of a warrant but also to assessing its scope. *United States v. Srivastava*, 540 F.3d 277, 290, n.16 (4th Cir. 2008).

Mindful of these considerations, we are confident that the contested seizures in this case fell comfortably within the warrant's scope. Even those seized documents forming the cornerstone of Phillips's securities law violations were authorized by the language of the warrant, which is broad and permissive. Part I of Attachment A, for example, contains an extensive list of fraudulently purchased items, including, among other things, "[a] 1901-S Morgan Silver Dollar," "[a] Celestron Nexstar 8 GPS telescope," "[a] Canon GL2 3 Chip Camcorder," "[a] pool table," and "[a] CD/Record Player." Part I does not stop there, however. It includes not only the items themselves but also "*evidence of* appliances, devices, furniture, equipment, property, items generally, and services that represent purchases using credit cards obtained by fraud and/or proceeds of other forms of fraud or financial crimes." (emphasis added). Because Phillips purchased Phydea advertisements in Investor's Business Daily with a fraudulent credit card, the invoices relating to the purchase of that advertising service thus fall within the scope of Part I as "evidence of . . .

services that represent purchases using credit cards obtained by fraud."

The language used in Part II of Attachment A is even more comprehensive, describing "[i]tems that relate to or constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§§ 1028, 1029 or 1344." Part II gives some specific examples of such evidence but cautions that those examples do not constitute a complete listing, using the phrase "including but not limited to." Moreover, the categories of evidence in Part II are broadly inclusive, describing, among other types of documents, "[m]ail, books, records, receipts, notes, ledgers and other papers," "computerized electronic records," "bank statements and bank records," and "[c]hecks, pass books, bank checks."

The remainder of the contested seizures falls within the ambit of Part II's inclusive language. For example, Phillips's personal financial records were seizable because they were evidence that Phillips did, in fact, misrepresent his individual income on a credit card application. Phillips claims that, because he applied for the credit card in his *father*'s name, he misstated only his *father*'s income, which could not be verified with his own financial records. However, officers could not be expected to parse that sort of distinction on the spot, especially since Phillips added himself as an authorized user to the same credit card. Similarly, many Phydea and Phydea Equity Fund documents fall within the broad language of Part II, since these documents were relevant to proving that Phillips misstated not only his personal income but also his company's income on a credit card application. The individual investor files, for example, were relevant to this inquiry, because the amount that investors invested in Phydea or Phydea Equity Fund was tied directly to the companies' revenue and expectations of revenue.

Further, because Phillips used his personal bank accounts to write bad checks, and, moreover, wrote bad checks to

credit card companies, the agents were justified in seizing his "bank statements and bank records." In cases of financial fraud, "the financial records of a suspect may well be highly probative of violations of a federal fraud statute." *Srivastava*, 540 F.3d at 292 (citation omitted). To be sure, not every item that falls within the language of the warrant will prove probative in a future criminal prosecution, but that is not the point. The language of the warrant is inclusive for this very reason, namely that the evidentiary significance of each and every item may not be instantly apparent.

Phillips, however, urges a reading of the warrant's language that defies the "commonsense and realistic" interpretation demanded of us. His position would require us to hold that an item reasonably encompassed by the terms of the warrant somehow falls outside its scope because the item is probative of charges other than those initial charges set forth by the warrant. In his case, Phillips argues that because the warrant was issued for various credit card offenses, the seized items relevant to securities fraud as well should somehow be suppressed. This is not the law. Courts have never held that a search is overbroad merely because it results in additional criminal charges. *See, e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 482-84 (1976). Often, a single piece of evidence will be probative of multiple crimes, especially in cases like this one, which involve intricate, interweaving, and extensive financial fraud schemes.

Our recent opinion in *United States v. Srivastava*, 540 F.3d 277 (4th Cir. 2008), is instructive. There, we addressed a situation in which officers' execution of a warrant issued for medical billing fraud turned up evidence of tax fraud. *Id.* at 281-83. The defendant cardiologist contested the seizure of *personal* tax records under a warrant issued to investigate his *business's* medical billing practices. *Id.* at 290. The court found this argument unpersuasive in light of the significant nexus between his personal and business operations. *Id.* Noting that the defendant operated his business as a Subchapter

S corporation, thereby passing business income through to himself as an individual for tax purposes, we explained: "In such circumstances, it is difficult to realistically define a bright line between 'personal financial records' and 'business records.' . . . Rather, it is consistent with both common sense and realism to deem the financial records relating to the medical practice as being nearly synonymous with the financial records of [him] individually." *Id.*

Here, too, Phillips's fraudulent schemes were interrelated and the evidence of each intermingled. The various schemes were mutually reinforcing: Phillips's misrepresentations of his own identity, among other things, enabled him to obtain fraudulent credit cards; his credit card fraud underwrote his securities fraud, facilitating the purchase of advertisements intended to lure investors into his illegitimate business; and the misstated "income" from that illegitimate business helped him fraudulently obtain credit cards. Just as Phillips overstated the success of his companies to credit card companies in credit card applications, so too he overstated the success of his companies to investors in advertisements. On these facts, it is unsurprising that items seized under the warrant supported multiple charges of fraud.

## B.

Phillips next argues that the only items that fall within the scope of a warrant are those that are explicitly named and precisely catalogued. For example, notwithstanding the "including but not limited to" language, Phillips suggests that the only Phydea documents that were seizable under the warrant were those mentioned by name: "[p]ayments to Interland Web Hosting for the hosting of a webpage titled PHYDEA.com." For other items to be seizable, the warrant must have been more particularized.

Contrary to Phillips's contention, law enforcement officers may seize an item pursuant to a warrant even if the warrant

does not expressly mention and painstakingly describe it. *See Dornhofer*, 859 F.2d 1195, 1198 (4th Cir. 1988) (refusing to hold "that only those items particularly described in [a warrant] may be seized without regard to the facts and circumstances of the particular case") (internal quotations and citation omitted). A warrant need not — and in most cases, cannot — scrupulously list and delineate each and every item to be seized. Frequently, it is simply impossible for law enforcement officers to know in advance exactly what business records the defendant maintains or how the case against him will unfold.

Indeed, especially in cases such as this one—involving complex crime schemes, with interwoven frauds — courts have routinely upheld the seizure of items described under a warrant's broad and inclusive language. *See, e.g.*, *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981). For example, in *Andresen v. Maryland*, the Supreme Court upheld the seizure of an extensive array of documents under a warrant that authorized the seizure of items "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." 427 U.S. 463, 479 (1976). This circuit has similarly allowed the seizure of a "broad range of things" on the basis of language permitting officers to seize "fruits, evidence and instrumentalities of false claims submissions" and items "including, but not limited to" business records. *Srivastava*, 540 F.3d at 280, 289. The warrant in the case at bar bears striking similarities to those upheld in the aforementioned precedent.

The rationale for these holdings is straightforward. In cases of this sort, investigators must "follow the money" to gradually unravel the lengthy paper trail left by a defendant's illegal operations. *See Srivastava*, 540 F.3d at 291-92. As the Supreme Court explained, complex fraud cases often require investigators to assemble a "jigsaw puzzle" by piecing together "many bits of evidence" that, "taken singly, would show comparatively little." *Andresen*, 427 U.S. at 480-81, n.

10. For "in the context of a fraud investigation, the relevant evidence will in many instances be fragmentary, discovered in bits and pieces, and thus difficult to either identify or secure. Standing alone, a particular document may appear innocuous or entirely innocent, and yet be an important piece of the jigsaw puzzle that investigators must assemble." *Srivastava*, 540 F.3d at 291. In choosing to uphold contested seizures pursuant to inclusive language, courts have insisted that the "complexity of an illegal scheme may not be used as a shield to avoid detection." *Andresen*, 427 U.S. at 480-81, n.10; *see also Srivastava*, 540 F.3d at 291.

We thus decline to allow Phillips to create a safe harbor from the complexity of his schemes. His crimes were multiple and intricate. Phillips perpetrated his crimes in-person, by U.S. mail, by telephone, and on the Internet. He lied about his name, income, and social security number; he used a fake driver's license; he ran up costly bills with fraudulent credit cards that he never paid off; he funded a gambling habit with a stolen identity; and he wrote countless bad checks. To investigate and prosecute crimes of this nature, the government may need a diverse and extensive set of documents at its disposal. The language of the warrant anticipates that very possibility. The warrant thus sufficiently authorized the seizure of the contested evidence here, even if that evidence was not specifically listed and meticulously described.*

---

*We reject as well Phillips's related argument that at the time the agents seized the Phydea-related records, the agents had no reason to connect Phydea with Phillips' alleged credit card and identity theft schemes. In fact, Attachment A mentioned "Phydea" by name twice, the head postal inspector's operation plan explained that Phillips "ha[d] a webpage called PHYDEA.com and use[d] this same email address to make his purchases," and the incorporated affidavit mentioned the name "Phydea" ten times, including an explicit statement that Phillips used a fraudulent credit card to "execute several transactions involving PHYDEA.com." As the district court explained, "there was perfectly good reason for the Phydea records to be seized in connection with the credit card investigation. And I find that."

## C.

Finally, Phillips argues that the agents executing the search warrant acted unreasonably by failing to distinguish between Phydea and Phydea Equity Fund at the time of the search. Even assuming that the Phydea documents were properly seized, Phillips contends, the Phydea Equity Fund documents were not, because the affidavit set forth no facts connecting these documents to Phillips's alleged fraud and in fact never even mentioned the name "Phydea Equity Fund." Thus, Phillips asserts that the agents' seizure of those documents was unreasonable. We hold otherwise.

The touchstone of Fourth Amendment analysis is reasonableness, and the "relevant inquiry is whether the search and seizures were reasonable under all the circumstances." *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000) (citation and internal quotations omitted); *see also United States v. Owens*, 848 F.2d 462 (4th Cir. 1988). In determining whether officers executing a search warrant acted reasonably, courts must examine only those "facts available to the officers at the time." *Maryland v. Garrison*, 480 U.S. 79, 88 (1987).

Reasonableness does not, by definition, entail perfection. Rather, the reasonableness inquiry acknowledges the ambiguous and often dangerous circumstances confronting officers in the process of executing search warrants and therefore affords officers "some latitude for honest mistakes." *Id.* at 87; *United States v. Patterson*, 278 F.3d 315, 317 (4th Cir. 2002); *see also Garrison*, 480 U.S. at 87 (The Fourth Amendment demands "sufficient probability, not certainty.") (citation and internal quotations omitted).

---

The district court likewise found as a fact that the original search was in no way a "subterfuge" for drumming up a securities fraud case out of allegations of credit card fraud. As the district court stated, "I find as a fact that absolutely did not occur."

In examining the information available to the agents at the time of the search, we agree with the district court that "the search was entirely reasonable and constitutional." Only with the benefit of hindsight are we now able to definitively ascertain a document's ultimate significance. And we now know, after a full jury trial and on appeal, that the Phydea Equity Fund records were probative primarily of securities fraud rather than the initial charges against Phillips. However, given Phydea's clear connections to Phillips's alleged fraud, and given Phydea Equity Fund's obvious relationships to Phydea (the least of which is its partially shared name), the agents acted reasonably in their seizure of both Phydea and Phydea Equity Fund documents.

In fact, this is what the district court found after conducting a four-day evidentiary hearing, which included testimony from all of the executing agents. The district court explained why it was unnecessary for the agents to distinguish between Phydea and Phydea Equity Fund:

> Let me mention here the reason I think Phydea can be referred to generically. This is not GM and GMAC. . . . [The] fact of the matter is that he's got Phydea.com, Phydea, whatever the various Phydea's names are, one can reasonably infer that, for purposes of the seizure, . . . distinctions between, . . . at the stage of the search, . . . the different entities or LLC's or corporations did not have to be drawn.
>
> So I think the agents acted entirely reasonably and constitutionally in not making fine distinctions at that stage between the Phydea entities.

To require agents to make fine-tuned distinctions between the two entities, and whatever other permutations of company structure might exist, is to hold them to too high a standard. The agents in this case, like all law enforcement officers who execute a search warrant, labored under limitations of time

and knowledge. Experienced counsel may spend weeks and months sifting through voluminous documentary evidence in an effort to reconstruct the modus operandi of a criminal operation. The agents lacked the time, the training in principles of accounting and business structure, and the sense of context to perform a comparable task. Nor would we want them to. Demanding perfection "would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search." *United States v. Wuagneux*, 683 F.2d 1343, 1353 (11th Cir. 1982) (citation and internal quotations omitted). A prompt exit from the premises accompanied by a few excusable, "honest mistakes" is far preferable to officers' encampment in a residence while they relentlessly scrutinize each and every item they encounter. As the Second Circuit noted in upholding the wholesale seizure of "fur coats . . . and other finished fur products" in a fur store, "the task of identifying and seizing the specific garments would have required a legion of fur experts to perform the task in a reasonable period." *United States v. Scharfman*, 448 F.2d 1352, 1353-54 & n.1 (2d Cir. 1971).

None of this is to suggest that the agents had free rein to ransack and take what they liked. The search was for a purpose which the agents were not free to exceed. But "general, exploratory rummaging," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), was not what happened here. As the district court found, the agents "acted responsibly, reasonably and sensibly." Their actions were, in the words of that court, "the reverse of cavalier" and at all times "measured and appropriate." To the extent that any mistakes were made, the district court found that they were "absolutely good faith mistakes." The only documents taken were financial documents, and indeed the agents left many financial documents behind. Consequently, we hold that the seizure of the evidence in this case, including that of the Phydea Equity Fund records, was constitutionally sound.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.