**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4672**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KAREN KIMBLE, a/k/a Karen Kimble Mamah, a/k/a Karen Mamah,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. William D. Quarles, Jr., District Judge. (1:13−cr−00035−WDQ−1)

Argued: March 24, 2017                                      Decided: May 2, 2017

Before TRAXLER and WYNN, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Traxler and Senior Judge Davis joined.

**ARGUED:** Vincent Anthony Jankoski, VINCENT A. JANKOSKI, ESQ., Silver Spring, Maryland, for Appellant. Kathleen O'Connell Gavin, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WYNN, Circuit Judge:

Following a two-day bench trial, the district court convicted Defendant Karen Kimble of numerous charges stemming from her submission of fraudulent immigration and tax filings to various state and federal agencies over a nearly five-year span. Seeking to overturn her conviction, Defendant argues that the district court erred in admitting certain evidence obtained following a search of her home pursuant to a validly issued warrant. For the reasons set forth below, we conclude that the district court correctly admitted this evidence, which—together with additional evidence offered at trial— provided sufficient support for the trial court's guilty verdict on each of the government's charges against Defendant. Accordingly, we affirm.

I.

A.

A summary of the facts proven at trial, as found by the district court, follows. Between 2007 and 2011, Defendant perpetrated a series of schemes that ultimately led to her indictment on charges ranging from tax and visa application fraud to aggravated identity theft. First, in the fall of 2007, Defendant participated in a marriage and immigration fraud scheme with Tamim Mamah, a native of Ghana. According to the government, after Mamah's earlier attempt to obtain a green card by means of a fraudulent marriage failed, Defendant filed, under Mamah's first wife's name, for a divorce from Mamah. Thereafter, Defendant submitted a new green card application on Mamah's behalf using a marriage certificate listing herself as Mamah's wife.

During roughly the same period, in September 2007, Defendant committed perjury in connection with her testimony in the criminal trial of Mamah's brother, who was charged with importing heroin in his luggage on a flight from Ghana. At that trial, Defendant testified that she traveled with Mamah's brother to Ghana in 2006. In particular, Defendant testified that, during that trip, she observed numerous individuals visit the brother's home, which she asserted was customary in Ghana. The defense relied on Defendant's testimony as evidence that someone other than Mamah's brother packed his luggage and placed the heroin in his bag. However, a subsequent review of Defendant's travel records revealed that she did not travel to Africa during the period in question.

Finally, beginning in February 2008 and continuing through at least April 2012, Defendant submitted numerous fraudulent tax returns for herself and others. In addition to inflating her own refunds, Defendant—who falsely held herself out as a certified tax preparer—filed returns on behalf of others that included artificially inflated credits and deductions. Defendant provided the taxpayers with versions of the returns that did not include the inflated figures and kept the excess refunds, which totaled roughly $222,000. During the course of her tax fraud scheme, Defendant committed identity theft on at least four occasions.

## B.

In July 2011, the Department of Homeland Security ("Homeland Security") obtained a search warrant in connection with its investigation of Defendant's marriage and immigration fraud and perjury. In an accompanying affidavit, the government

3

asserted probable cause to believe that Defendant's home contained evidence of perjury, marriage and immigration fraud, and false statements, in violation of 18 U.S.C. §§ 1001, 1425, 1621, and 1623 and 8 U.S.C. § 1325(c). Entitled "Items to be Seized from [Defendant's Residence]," Attachment B to the warrant affidavit averred that the requested search would enable the government to seize "[a]ny and all records and documents relating to the travel of [Defendant] to Ghana in 2006 including but not limited to . . . documents, correspondence, notes, statements, receipts or other records that reference or indicate the fraudulent activity [and] items evidencing the obtaining, secreting, transferring, concealment and/or expenditure of illegal proceeds and currency to include cash." J.A. 46.

Homeland Security agents executed the search warrant on July 29, 2011. At the beginning of the search, the agents asked Defendant if she had any valuables in the house, to which Defendant replied that there was some cash in a laundry basket. Defendant then led the agents to the cash, which was contained in a bag in a laundry basket in the home and totaled more than $41,000. When the agents inquired as to the source of the funds, Defendant told the agents that the cash did not belong to her. Rather, she said that, at Mamah's request, she had retrieved the cash from a stranger about a week earlier and was holding it for Mamah. Aware Mamah was detained on unrelated narcotics distribution charges, the agents seized the cash on suspicion that it derived from Mamah's alleged drug activity.

Several months later, Defendant filed a claim to recover the seized funds. At odds with the explanation she gave at the time of the initial seizure, Defendant claimed that the

cash was proceeds of an insurance claim she filed after her home was damaged in a fire. Their suspicions piqued by Defendant's revised account, investigators subpoenaed Defendant's bank records in an attempt to confirm the source of the seized funds. After reviewing the records, however, investigators found numerous deposits from the Internal Revenue Service, which they later determined to be the inflated refunds obtained through Defendant's tax fraud scheme.

After further investigation, the government charged Defendant in a twenty-one-count indictment with: (1) six counts of wire fraud, in violation of 18 U.S.C. § 1343; (2) five counts of making a false statement on a tax return, in violation of 26 U.S.C. § 7206(1); (3) five counts of aiding and assisting in the making of a false tax return, in violation of 26 U.S.C. § 7206(2); (4) four counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A; and (5) one count of visa application fraud, in violation of 18 U.S.C. § 1546(a).[1]

On May 1, 2013, Defendant moved to suppress all evidence obtained as a result of the July 2011 search of her home. Specifically, Defendant argued that the warrant supporting that search addressed only the government's then-current investigation of her alleged perjury, such that much of the property seized during the search (in particular, the more-than $41,000 in cash) exceeded the scope of the warrant. In Defendant's view, because the cash was improperly seized, any evidence obtained as result of her subsequent efforts to reclaim the seized funds (*i.e.*, bank records and other tax records

---

[1] In a separate action, Defendant pleaded guilty to perjury in connection with her September 2007 testimony on behalf of Mamah's brother.

5

documenting Defendant's submission of fraudulent tax returns) amounted to "fruit" of the illegal seizure and therefore was subject to exclusion at trial. After Defendant waived her right to a jury trial, the district court elected to hear evidence and argument regarding the suppression motion at trial.

A two-day bench trial followed, during which the district court heard testimony from Defendant's alleged victims and officials from the various federal agencies involved in the investigations that precipitated Defendant's prosecution. Among those witnesses, Homeland Security Special Agent Eli Bupp testified that, in executing the search of Defendant's residence, agents sought to obtain "[d]ocuments and evidence related to marriage fraud [and] visa fraud, [and other] travel documents." J.A. 69. Bupp characterized the heading in Attachment B, which focused on documents and records relating to Defendant's purported travel to Ghana, as a "drafting error" that was not meant to limit the scope of the search. J.A. 70. The government also emphasized that the affidavit supporting the warrant included representations regarding the government's basis for believing that Defendant not only committed perjury, but also committed visa and marriage fraud and made false statements to authorities.

At the close of evidence, Defendant moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Defendant subsequently withdrew her Rule 29 motion as to the immigration fraud charge, and the district court denied Defendant's motion as to the remaining charges. The district court further denied Defendant's motion to suppress the evidence obtained as a result of the July 2011 search and, in a comprehensive written opinion, convicted Defendant on all counts. The district court

6

later sentenced Defendant to a total of 48 months' incarceration, prompting this timely appeal.

## II.

Defendant raises two issues on appeal. First, she argues that the district court erred in denying her motion to suppress the more-than $41,000 in cash seized from her home in the course of the July 2011 search, as well as any incriminating evidence obtained as a result of that initial seizure. Second, Defendant challenges the denial of her post-trial motion for judgment of acquittal on the government's wire and tax fraud charges. We consider these proposed grounds for reversal in turn.

## A.

We turn first to the parties' evidentiary dispute. Defendant does not challenge the validity of the warrant authorizing the search of her home in July 2011. Instead, Defendant argues that the valid warrant did not permit the agents to seize the cash found in the laundry basket. Defendant's challenge thus calls on us to consider whether the seizure exceeded the scope of the warrant. In so doing, we review the district court's legal conclusions regarding the scope of the warrant de novo and the factual findings underlying those conclusions for clear error. *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009).

## 1.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Although the Fourth Amendment does not "expressly preclud[e] the use of evidence obtained in violation of" its protections, *Arizona v. Evans*, 514 U.S. 1, 10 (1995), courts have long relied on the judicially created "exclusionary rule" to ensure that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citing authorities). "This prohibition applies as well to the fruits of [any] illegally seized evidence." *Id.*

It is axiomatic that a "search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization." *Phillips*, 588 F.3d at 223 (citing authorities). Thus, a valid warrant "must particularly describe the place to be searched, and the persons or things to be seized." *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (alteration and internal quotation marks omitted) (quoting *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001)). "This particularity requirement protects against 'a general, exploratory rummaging in a person's belongings,' to the extent that a valid warrant leaves nothing to the discretion of the officers performing the search." *Id.* (quoting *Robinson*, 275 F.3d at 381). As such, even when law enforcement officers conduct a search pursuant to a valid warrant, the "officers cannot grossly exceed the scope of a search warrant in *seizing* property." *Id.* (internal quotation marks omitted).

At the same time, we have long recognized that "a search warrant is not a 'constitutional strait jacket.'" *Phillips*, 588 F.3d at 223 (quoting *United States v.*

8

*Dornhofer*, 859 F.2d 1195, 1198 (4th Cir. 1988)). Rather, we "employ a commonsense and realistic approach [in interpreting warrants], and avoid hypertechnical scrutiny . . . lest police officers be encouraged to forgo the warrant application process altogether." *Id.* (citation and internal quotation marks omitted); *see also United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (same).

Defendant argues that the agents' seizure of the cash in this case violated the Fourth Amendment because the warrant permitted the agents to seize evidence relating only to her purported travel to Ghana with her brother-in-law—the subject of her perjured testimony. In support, Defendant points to the prefatory language in Attachment B to the warrant, which included a list of items to be seized preceded by the phrase "[a]ny and all records and documents relating to the travel of [Defendant] to Ghana in 2006." J.A. 46. Defendant argues that the seizure of the cash—which, at the time of the seizure, the agents admittedly believed to be linked to unrelated drug activity—exceeded the scope of the warrant because it could not have related to Defendant's alleged perjury. Defendant further contends that the additional evidence developed by investigators after Defendant later sought to reclaim the seized funds must be suppressed as "fruit of the illegal seizure." Appellant's Br. at 22.

In response, the government emphasizes that, in determining whether a search or seizure exceeds the scope of a warrant, our inquiry "is one of practical, rather than hyper-technical, accuracy." Appellee's Br. at 14 (citing *United States v. Gary*, 528 F.3d 324, 328–29 (4th Cir. 2008)). Read holistically, the government argues, the warrant and

9

supporting affidavit make clear that investigators were authorized to seize evidence of perjury *and* marriage or immigration fraud during their search. We agree.

On its face, the warrant application indicates that the proposed search is "related to a violation" of not only the federal statutes criminalizing perjury and false declarations before a grand jury—the offenses related to Defendant's purported travel to Ghana—but also "marriage fraud, false statement[s], [and] procurement of cit[i]zenship or naturalization unlawfully." J.A. 43. Likewise, the warrant itself lists the property to be seized as the "[f]ruits, evidence and instrumentalities of marriage fraud, false statement[s], unlawful procurement of citizenship, and perjury." J.A. 44.

To be sure, both the government's application and the resulting warrant also incorporate by reference Attachment B when describing the property to be seized during the course of the government's search. And Defendant correctly notes that the attachment refers most directly to evidence of Defendant's purported travel to Ghana. Nonetheless, its prefatory language notwithstanding, Attachment B did not limit the items subject to seizure to potential evidence of Defendant's alleged misrepresentations regarding her overseas travel. For example, among the items identified as subject to seizure are records of vehicles titled in Defendant's or Mamah's name; documents and correspondence referring to or indicating fraudulent activity; and all manner of financial records or other evidence of obtaining, concealing, or spending illegal proceeds.

Much the same, the affidavit supporting the warrant application not only includes detailed allegations regarding Defendant's perjury, but also describes at length the government's investigation of Defendant's efforts to fraudulently obtain a green card for

10

Mamah. That section of the affidavit concludes, "Your affiant . . . believes that in [Defendant's home] there is evidence of violations of [various federal marriage and visa fraud statutes]." J.A. 56. In sum, a "practical" and "non-hypertechnical" reading of the warrant establishes that the government's authority in executing the search was not as limited as Defendant maintains. Instead, by its express terms, the warrant permitted the government to seize from Defendant's residence potential evidence of both Defendant's false statements in connection with her September 2007 testimony about her purported trip to Ghana and her marriage and immigration fraud.

2.

Apart from seeking to narrow the scope of the warrant, Defendant argues that— even if the warrant encompassed evidence related to her alleged marriage and immigration fraud—the seizure of the cash violated the Fourth Amendment because the agents initially seized it as evidence of suspected drug activity, not as evidence of any of the offenses set forth in the warrant. We disagree.

"[T]he scope of a search conducted pursuant to a warrant is defined *objectively* by the terms of the warrant and the evidence sought, not by the *subjective* motivations of an officer." *Williams*, 592 F.3d at 522 (citing authorities); *see also United States v. Srivastava*, 540 F.3d 277, 287 (4th Cir. 2008) ("In analyzing the constitutionality of a search warrant's execution, we must conduct an objective assessment of the executing officer's actions in light of the facts and circumstances confronting him at the time, rather than make a subjective evaluation of the officer's actual state of mind at the time the challenged action was taken." (alteration and internal quotation marks omitted) (quoting

11

*Maryland v. Macon*, 472 U.S. 463, 470–71 (1985))). Accordingly, to determine whether the agents lawfully seized the cash in Defendant's laundry basket, we must consider whether the seized cash objectively constituted potential "[f]ruits, evidence and instrumentalities of marriage fraud, false statement[s], unlawful procurement of citizenship, [or] perjury." J.A. 44. Or, as set out in Attachment B, whether a reasonable officer conducting the search could believe the cash to constitute potential "evidenc[e of] the obtaining, secreting, transferring, concealment and/or expenditure of illegal proceeds" of such crimes. J.A. 46. We conclude that a reasonable officer could.

Although "not every item that falls within the language of the warrant will prove probative in a future criminal prosecution, . . . the evidentiary significance of each and every item may not be instantly apparent" during the course of a search. *Phillips*, 588 F.3d at 224. As a result, items seized pursuant to a validly issued warrant are "not required, on their face, to necessarily constitute evidence of [an offense identified in the relevant warrant]—rather, they only *potentially* ha[ve] to be evidence of such [offense]." *Srivastava*, 540 F.3d at 291 (emphasis added). Moreover, we have observed that, "[o]ften, a single piece of evidence will be probative of multiple crimes, especially in cases . . . which involve intricate, interweaving, and extensive financial fraud schemes." *Phillips*, 588 F.3d at 224 (finding that evidence seized to prove securities fraud fell under scope of warrant targeting evidence of credit card fraud); *see also Srivastava*, 540 F.3d at 287–91 (permitting seizure of defendant's personal tax records under warrant targeting business's medical billing practices where defendant operated business as a sole proprietorship).

12

Viewed in this light, the seized cash fell within the scope of the warrant.[2]  In particular, given the large quantity of cash at issue, as well as Defendant's unusual explanation for the source of the funds, an agent executing the warrant could reasonably have concluded that the more-than $41,000 in cash Defendant voluntarily revealed at the outset of the search was potentially proceeds of marriage and immigration fraud, *i.e.*, cash received as payment for Defendant's participation in the scheme to obtain a fraudulent green card for Mamah.  Consequently, because the challenged seizure did not exceed the scope of the warrant, the district court properly denied Defendant's motion to suppress evidence arising from that initial seizure.

### B.

Having concluded that the district court properly denied the motion to suppress, we turn next to Defendant's contention that the government failed to meet its burden of proving the tax and wire fraud charges against Defendant beyond a reasonable doubt.  In doing so, we review the district court's denial of Defendant's motion for judgment of acquittal de novo.  *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014).

As noted above, in addition to marriage and immigration fraud, the grand jury charged Defendant with six counts of wire fraud and five counts of aiding or assisting tax

---

[2]  That the cash ultimately led to a broadened investigation and additional charges against Defendant does not undermine the validity of its seizure.  Indeed, we have "never held that a search is overbroad merely because it results in additional criminal charges." *Williams*, 592 F.3d at 520 (quoting *Phillips,* 588 F.3d at 224) (internal quotation marks omitted).  Instead, "[w]hether seized evidence falls within the scope of a warrant's authorization must be assessed solely in light of the relation between the evidence and the terms of the warrant's authorization." *Id.* at 520–21.  As such, the fact that evidence seized from Defendant's home led to tax fraud charges not identified in the government's application or the warrant itself does not render the challenged seizure unconstitutional.

13

fraud. These charges stemmed from Defendant's alleged transmission via interstate wires of tax returns on behalf of four individuals in 2009 and 2010, with Defendant allegedly submitting returns on behalf of two of those individuals in both years. At trial, the government offered extensive evidence—including testimony from the taxpayers identified in the indictment, bank records, and other documentary evidence—demonstrating that Defendant, who held herself out as a certified tax preparer to her friends and coworkers, fraudulently obtained inflated tax refunds on behalf of the taxpayers who sought her assistance. The government's evidence further suggested that Defendant provided the taxpayers with "dummy" returns to conceal her fraud, thereby permitting her to retain the portion of the refunds attributable to the unauthorized deductions and credits.

In light of this evidence, Defendant concedes that "[t]aken in the light most favorable to the government, the evidence . . . showed that [she] prepared tax returns for various taxpayers and, unbeknownst to those taxpayers, took unauthorized deductions." Appellant's Br. at 26. In challenging the sufficiency of the evidence against her, however, Defendant argues that the wire and tax fraud charges rested on an "aiding and abetting" theory of liability. Under this theory, Defendant maintains, the court could convict her of "aiding and abetting" wire and tax fraud *only if* the taxpayers *themselves* were aware of Defendant's fraudulent filings and thus served as "principals" whom Defendant aided or abetted. Because the government's evidence established that the taxpayers were unaware of the fraud, Defendant contends that the government failed as a

14

matter of law to prove these charges beyond a reasonable doubt. This argument's cleverness does not obscure its lack of merit.

Defendant's argument misunderstands the nature of the government's charges and evidence presented against her at trial. As an initial matter, in the federal system, culpability for an offense as an aider and abettor is treated no differently from treatment as a principal. *See United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) ("Aiding and abetting is not an independent crime [and, instead,] merely obviates the need for awkward phrasing and strained readings of statutes by making clear that in all crimes an accessory will be punished as a principal. Thus, aiding and abetting is implicit in all indictments." (citations and internal quotation marks omitted)). For this reason, "the precise language used in the indictment, by the prosecution, or in the jury instructions is unimportant. So long as all of the elements necessary to find [the defendant] guilty of the crime, whether as a principal or as aider or abettor, were put before the jury, conviction will be proper." *Id.*

As to Defendant's wire fraud charges, the indictment charged Defendant with aiding and abetting, in violation of 18 U.S.C. § 2, *and* the substantive offense set out in 18 U.S.C. § 1343. Defendant concedes that the evidence presented at trial demonstrated that she submitted fraudulent tax returns via interstate wires in order to obtain a portion of the fraudulent refunds for herself. *See* Appellant's Reply Br. at 16 (arguing that the government's evidence "showed that, in this case, there was no principal *other than appellant*" (emphasis added)). Accordingly, sufficient evidence supported her conviction

for wire fraud, and the district court properly denied her motion for judgment of acquittal on these charges.[3]

Defendant's argument that her tax fraud convictions were not supported by the evidence also finds no support in the law. The trial court convicted Defendant of violating 26 U.S.C. § 7206(2), which reads:

> Any person who . . . [w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, *whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document* . . . shall be guilty of a felony . . . .

26 U.S.C. § 7206(2) (emphasis added).

Defendant argues that she cannot be convicted under Section 7206(2) because *she* submitted the fraudulent tax returns, not the taxpayers. Defendant contrasts Section 7206(2) with the immediately preceding section, which prohibits "[w]illfully mak[ing] and subscrib[ing] any return . . . which [the defendant] does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). According to Defendant, because she prepared and submitted the fraudulent returns, she may be convicted, if at all, only as a principal under Section 7206(1) and not as an aider and abettor under Section 7206(2).

---

[3] Defendant repeatedly emphasizes language in the indictment alleging that she "caused the submission" of fraudulent tax returns, which Defendant describes as "the language of aiding and abetting." *See, e.g.*, Appellant's Reply Br. at 16. On the contrary, the substantive wire fraud statute specifically prohibits "*caus[ing] to be transmitted* by means of wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing" a fraud. 18 U.S.C. § 1343.

16

We addressed the elements of Sections 7206(1) and 7206(2) in *United States v. Aramony*, 88 F.3d 1369 (4th Cir. 1996). There, we explained that, "[t]o obtain a conviction under . . . [Section] 7206(1), the government must prove the following elements beyond a reasonable doubt: (1) the defendant made and subscribed to a tax return containing a written declaration; (2) the tax return was made under penalties of perjury; (3) the defendant did not believe the return to be true and correct as to every material matter; and (4) the defendant acted willfully." 88 F.3d at 1382 (citing *United States v. Owen*, 15 F.3d 1528, 1532 (10th Cir. 1994)). By comparison, a conviction under Section 7206(2) is appropriate when the government shows: "(1) the defendant aided, assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful." *Id.* (quoting *United States v. Salerno,* 902 F.2d 1429, 1432 (9th Cir. 1990) (internal quotation marks omitted); *see also United States v. Kamalu*, 298 F. App'x 251, 255 (4th Cir. 2008). Accordingly, although "[s]ubsection (1) directly prohibits false statements by the taxpayer[,] subsection (2) applies to those, *such as tax preparers*, who aid or assist the taxpayer in making such statements." *United States v. Rogers*, 853 F.2d 249, 251 n.2 (4th Cir. 1988) (emphasis added).

Here, the indictment alleged—and the government's evidence amply established—that Defendant, acting under false pretenses, "caused the preparation and presentation of" fraudulent tax returns on behalf of her innocent friends and coworkers. J.A. 449. As we explained in *Rogers*, this conduct—preparing false tax returns on behalf

17

of others—falls under Section 7206(2), not Section 7206(1).[4] *Rogers*, 853 F.2d at 251. Indeed, Section 7206(2) explicitly provides for liability for tax preparers, like Defendant, who submit fraudulent returns, regardless of whether the taxpayer was aware of, much less consented to, any such fraud. *See* 26 U.S.C. § 7206(2) (providing for liability "whether or not [the] falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document"). Consequently, the district court correctly concluded that the evidence at trial supported its verdict on the tax fraud charges and properly denied Defendant's motion for judgment of acquittal.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[4] As a further illustration of the distinction between these provisions, in addition to being convicted under Section 7206(2) of preparing fraudulent returns on behalf of others, Defendant was convicted under Section 7206(1) for submitting fraudulent returns of her own between 2007 and 2011.