**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4171**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REGINALD DUANE DARGAN, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:11-cr-00578-CCB-3)

Argued: October 30, 2013          Decided: December 24, 2013

Before WILKINSON, AGEE, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Keenan joined.

**ARGUED**: Brian L. Stekloff, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP, Washington, D.C., for Appellant. Benjamin M. Block, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF**: Rod J. Rosenstein, United States Attorney, Sean Welsh, Legal Intern, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WILKINSON, Circuit Judge:

Appellant Reginald Dargan, Jr., was convicted by a jury of three counts arising from the armed robbery of a jewelry store. He now appeals his conviction, contending that the district court erred in denying his motion to suppress evidence seized pursuant to a warrant during a search of his residence. He also argues that testimony about out-of-court statements made by a co-conspirator was erroneously admitted in violation of both the Federal Rules of Evidence and the Confrontation Clause. For the following reasons, we reject Dargan's claims and affirm his conviction.

## I.

Shortly after noon on March 30, 2011, three men robbed a jewelry store located in a mall in Columbia, Maryland. Two of the participants were armed with firearms, while the third carried a knife. After waiting for a customer to leave, one of the men detained a sales clerk at gunpoint. Another held a knife to the clerk's leg and forced him to dump a case of Rolex watches into a bag. Meanwhile, the remaining culprit restrained a second employee at the back of the store. Once the watch case was emptied, the three men hastily exited the mall. They escaped with over thirty men's Rolex watches, with a retail value of approximately $275,000.

The following day, the police issued a news release asking the public to submit information relevant to the investigation. The release contained images of the suspects captured by mall security cameras. Based on tips received, the authorities arrested three individuals: Deontaye Harvey, Aaron Pratt, and Gary Braxton. Officials soon doubted Braxton's involvement, however, and he was released. The investigation also implicated a fourth individual, nicknamed "Little Reggie," who was not apprehended at that time.

Two months later, appellant Dargan was arrested in connection with the robbery. Police suspected that Dargan was in fact Little Reggie, the knife-wielding participant in the Columbia heist. Investigators subsequently obtained a search warrant for Dargan's residence. Attachment A to the warrant enumerated items subject to seizure, including, among other things, "[i]ndicia of occupancy." J.A. 70. During the search, officers seized a purchase receipt for a Louis Vuitton belt. The receipt was found in a bag located on top of a dresser in Dargan's bedroom. It indicated that the belt cost $461.10 and that the buyer, who identified himself as "Regg Raxx," purchased the belt with cash the day after the robbery.

On October 26, 2011, a federal grand jury returned an indictment against Dargan, Harvey, and Pratt. As relevant here, the indictment charged Dargan with conspiracy to interfere with,

3

as well as actual interference with, interstate commerce by robbery in violation of 18 U.S.C. § 1951. It also charged him with using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

Prior to trial, Dargan moved to suppress the purchase receipt for the Louis Vuitton belt seized during the search of his residence. The district court found that the receipt did not fall under the terms of Attachment A to the search warrant, but that the seizure was nevertheless justified under the plain-view exception to the warrant requirement.

The government also filed a pretrial motion to admit testimony regarding out-of-court statements made by Dargan's co-defendant, Harvey, to a cellmate, Zachary Shanaberger. The conversation took place after Braxton had been released and Dargan arrested. Specifically, the government intended to elicit testimony regarding Harvey's alleged confession to robbing a jewelry store in the Columbia Mall with two co-conspirators and his disclosure that they were all imprisoned in the same facility at the time of the conversation. In his statements to Shanaberger, Harvey did not identify the third participant -- whom the prosecution contended was Dargan -- by name.

The government argued that Harvey's comments were admissible under Federal Rule of Evidence 804(b)(3), which provides an exception to the general prohibition against hearsay

4

for statements against interest. Dargan not only contested this assertion, but further contended that the introduction of the statements at trial would violate his Confrontation Clause rights. Ruling from the bench, the district court rejected each of Dargan's objections and granted the government's motion.

At Dargan's trial, the prosecution both introduced the Louis Vuitton receipt and called Shanaberger as a witness. It also provided independent evidence directly linking Dargan to the Columbia robbery. For instance, the government called two witnesses who each identified Dargan as one of the culprits depicted in the footage taken by mall surveillance cameras. One of the witnesses was Dargan's own godmother, who had known him for over thirteen years.

The prosecution also introduced several text messages recovered from Dargan's phone pursuant to a search warrant. The messages were exchanged between Dargan and Harvey during the direct lead-up to the robbery. The conversation ceased during the actual commission of the crime. Shortly before 11:15 that morning, Harvey texted Dargan to "Get dressed . . . . We on. Da way." J.A. 620. At 11:16, he further instructed Dargan to "Bring da knife out." Id. Finally, at 11:43, Dargan texted Harvey to inform him that "We out front." Id.

On November 8, 2012, the jury found Dargan guilty of each of the three counts listed above. The district court sentenced

him to 135 months of incarceration, in addition to a period of supervised release and restitution. This appeal followed.

## II.

Dargan first contends that the seizure of the Louis Vuitton belt receipt violated the Fourth Amendment because the receipt did not fall under any of the items enumerated in Attachment A, which delineated the warrant's scope. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In interpreting the Fourth Amendment, the thought of unfettered police discretion is unthinkable, and any practice of minute judicial management is impractical, and the question thus must always be where the balance lies.

## A.

The last clause of the Fourth Amendment contains a "particularity requirement," which "is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves

6

nothing to the discretion of the officer executing the warrant." United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010). The Framers included this provision in order to end the practice, "abhorred by the colonists," of issuing "general warrants." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The requirement is designed to preclude broadly-phrased warrants from authorizing officers to conduct "exploratory rummaging in a person's belongings." Andresen v. Maryland, 427 U.S. 463, 480 (1976) (internal quotation marks omitted). Thus, when executing a warrant, officers are limited by its terms. Williams, 592 F.3d at 519.

Nevertheless, a warrant is not intended to impose a "constitutional strait jacket" on investigating officers. United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir. 1988) (internal quotation marks omitted). Courts must refrain from interpreting warrant terms in a "hypertechnical" manner, and should instead employ a "commonsense and realistic" approach. Williams, 592 F.3d at 519 (internal quotation marks omitted); see also Illinois v. Gates, 462 U.S. 213, 231 (1983) (using similar language with respect to judicial review of affidavits). This rule of construction strikes a middle ground by ensuring that warrants serve their central purpose -- precluding officers from conducting fishing expeditions into the private affairs of others -- while simultaneously preserving the flexibility of law

7

enforcement to adapt to the unforeseen circumstances that necessarily arise in an investigation predicated on incomplete information.

Interpreting warrants in a commonsense manner serves the further, significant purpose of encouraging officers to obtain judicial approval prior to conducting a search. United States v. Phillips, 588 F.3d 218, 223 (4th Cir. 2009). This court, along with many others, has stated a strong preference for officers to obtain a warrant prior to intruding on constitutionally protected domains. United States v. Srivastava, 540 F.3d 277, 288 (4th Cir. 2008). A warrant cabins executive discretion, gives the imprimatur of lawful authority to potentially intrusive police conduct, and helps to ensure that valuable evidence is not later excluded as a result of an illicit search. See Gates, 462 U.S. at 236. A "grudging or negative attitude by reviewing courts towards warrants" is inconsistent with this approach. Id. (internal quotation marks omitted).

An overly stringent rule of construction would encourage warrantless searches by reducing the benefits a warrant provides. Officers are motivated to secure judicial approval in part because of the safe harbor it represents. The sense of confidence a warrant affords, however, is diminished to the extent that its terms are subject to an excessively narrow interpretation. Faced with such an interpretation, "police might

8

well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search." See id. Courts can help to head off this eventuality by consistently adopting a commonsense reading of a warrant's scope.

B.

Here, Attachment A to the warrant, which enumerated the items subject to seizure, relevantly included "[i]ndicia of occupancy, residency, of the premises . . . including but not limited to, utility and telephone bills, [and] canceled envelopes." J.A. 70. The officers conducting the search could plausibly have thought that the occupant of the premises was also the purchaser identified on the belt receipt discovered in the bedroom. The receipt, which listed the buyer as "Regg Raxx," therefore constituted at least some indication of occupancy and fell within the terms of Attachment A.

This conclusion is corroborated by the warrant's inclusive language: Attachment A states that "[i]ndicia of occupancy" "includ[es]" but is "not limited to" certain listed items ("utility and telephone bills, [and] canceled envelopes"). Id. This "broad and inclusive language" cautions against a miserly construction. Phillips, 588 F.3d at 225. The fact that the warrant does not explicitly mention receipts is not

9

determinative: "law enforcement officers may seize an item pursuant to a warrant even if the warrant does not expressly mention and painstakingly describe it." Id. Indeed, "[a] warrant need not -- and in most cases, cannot -- scrupulously list and delineate each and every item to be seized." Id.

Here, the officers were lawfully in the residence pursuant to the search warrant. Furthermore, they were justified in opening the bag on top of the dresser in Dargan's bedroom to determine whether its contents matched any of the items they were authorized by the warrant to seize. Attachment A, for example, lists "[a]ny and all diaries, journals, or notes." J.A. 70. These documents -- as well as a host of other physically diminutive objects described in the attachment -- could easily have been placed in the retail bag. Contrary to Dargan's contention, the officers were not required to assume that the retail bag contained only retail items. See Williams, 592 F.3d at 522. People put all kinds of things in bags for reasons of convenience, carry, or concealment.

The facts of this case underscore the fallacy of Dargan's contention that only items listed by name may be seized during the execution of a search warrant. That would require officers possessed of incomplete knowledge to identify ex ante every item of evidence that will be relevant and the precise form that it will take -- a plainly unrealistic expectation. The officers in

the instant case may not have foreseen that indicia of occupancy located at the residence would take the form of a sales receipt but, once faced with precisely that scenario, they were entitled to seize the receipt under a commonsense reading of the warrant's terms. In no way could the search and seizure of the receipt be characterized as an "exploratory rummaging." The central value animating the particularity requirement was therefore preserved. See United States v. Robinson, 275 F.3d 371, 381 (4th Cir. 2001).

## III.

Dargan next objects to the admission of Shanaberger's testimony regarding out-of-court statements made by co-defendant Harvey to Shanaberger while the two were incarcerated together following the robbery. Specifically, Dargan seeks to exclude testimony with respect to two statements: Harvey's confession to robbing the Columbia Mall with two co-conspirators, and his comment that all three co-conspirators were incarcerated in the same facility at the time of his conversation with Shanaberger. Dargan contends not only that the statements are inadmissible under Federal Rule of Evidence 804(b)(3), but also that their introduction violated his constitutional right to confrontation. We address both contentions below.

11

A.

As a general matter, the Federal Rules of Evidence ban the introduction of hearsay testimony at trial. Rule 804, however, carves out an exception to this broad prohibition for specific categories of hearsay considered especially reliable. See Williamson v. United States, 512 U.S. 594, 598-99 (1994). As relevant here, 804(b)(3) provides that a statement made by an unavailable declarant is admissible if it is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability." The statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Id. The district court's decision to admit Shanaberger's testimony under this rule is reviewed for abuse of discretion. United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995).

It is undisputed that Harvey, having invoked his Fifth Amendment right not to testify, was unavailable within the meaning of 804(b)(3). See id. Dargan contends, however, that the government failed to carry its burden with respect to the two remaining elements: inculpation and corroboration.

12

The first of these requirements has been held to restrict admission to "those declarations or remarks within the confession that are individually self-inculpatory." Williamson, 512 U.S. at 599. Whether this standard is satisfied can only be determined by viewing the statement in light of the surrounding circumstances. Id. at 603.

Here, both the context and content of the challenged statements indicate their self-inculpatory quality. First, Harvey made the statements to a cellmate rather than, for instance, a police investigator. He thus had no obvious motive to "shift blame or curry favor." United States v. Jordan, 509 F.3d 191, 203 (4th Cir. 2007) (internal quotation marks omitted). Second, the statements are intrinsically inculpatory to the extent they demonstrate Harvey's knowledge of "significant details about the crime," Williamson, 512 U.S. at 603, and "implicate him in a conspiracy," United States v. Udeozor, 515 F.3d 260, 267 (4th Cir. 2008). Harvey's admission that he committed the robbery with the assistance of two co-conspirators not only revealed his knowledge of the number of participants, but also potentially subjected him to conspiracy liability. His statement that each of the participants was currently incarcerated at the same facility further evidenced his specific knowledge of the identities of the other robbers.

The statements were therefore sufficiently inculpatory to satisfy this element of the rule.

Rule 804(b)(3) also requires that statements against interest be supported by corroborating circumstances. Our court has enumerated several factors relevant to this particular inquiry, including:

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

United States v. Kivanc, 714 F.3d 782, 792 (4th Cir. 2013) (quoting Bumpass, 60 F.3d at 1102 (citations omitted)).

Considered together, these factors indicate that the corroborating circumstances requirement was satisfied here. Harvey had not pled guilty at the time of his statement, and thus remained exposed to the full range of penal consequences attached to his illicit conduct. See id. at 793. Furthermore, as noted, the statements were made to a fellow prisoner; Harvey thus had no motive to manipulate his narrative to please the authorities. See Jordan, 509 F.3d at 203. Finally, the gist of the statements was confirmed by a wealth of independent evidence introduced by the government at trial, including the series of

14

text messages between Dargan and Harvey discussing Dargan's use of a knife during the planned robbery. The district court therefore did not abuse its discretion under the Federal Rules in admitting Shanaberger's testimony.

B.

Dargan also contends that the introduction of Harvey's out-of-court statements violated his constitutional right to confront opposing witnesses. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This provision bars the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004).

"As Crawford and later Supreme Court cases make clear, a statement must be 'testimonial' to be excludable under the Confrontation Clause." Udeozor, 515 F.3d at 268. The primary determinant of a statement's testimonial quality is "whether a reasonable person in the declarant's position would have expected his statements to be used at trial -- that is, whether the declarant would have expected or intended to 'bear witness' against another in a later proceeding." Id. (citing Crawford,

15

541 U.S. at 52). This definition flows from the Court's recognition that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." Crawford, 541 U.S. at 50.

Under this standard, Harvey's comments to Shanaberger are plainly nontestimonial. Harvey made the challenged statements to a cellmate in an informal setting -- a scenario far afield from the type of declarations that represented the focus of Crawford's concern. The Supreme Court itself has noted, as a general matter, that "statements from one prisoner to another" are "clearly nontestimonial." Davis v. Washington, 547 U.S. 813, 825 (2006). Harvey's jailhouse disclosures to a casual acquaintance were not made with an eye towards trial. He had no plausible expectation of "bearing witness" against anyone. See United States v. Jones, 716 F.3d 851, 856 (4th Cir. 2013). The Confrontation Clause is therefore inapplicable, though such statements must, to be admissible, still satisfy the requirements of the Federal Rules of Evidence, here 804(b)(3).

Dargan devotes a significant portion of his brief to contending that Shanaberger's testimony was inadmissible under the Supreme Court's holding in Bruton v. United States, 391 U.S. 123 (1968). In that case, Bruton and his co-conspirator were tried jointly. The latter declined to testify, but his

16

confession -- which directly implicated Bruton -- was admitted against him at trial. The district judge gave a limiting instruction that the confession did not qualify as evidence against Bruton. Id. at 124-25, 128. On appeal, the Supreme Court reversed, noting the "substantial risk" that the jury would ignore the limiting instruction and thereby violate Bruton's Confrontation Clause rights. Id. at 126.

Dargan's reliance on Bruton is misplaced for several reasons. First, Dargan and Harvey were not tried jointly. Harvey pled guilty and Dargan received an individual trial. The formal structure of a Bruton claim is therefore absent. The "substantial risk" that a confession admitted against one defendant might affect the jury's verdict regarding his co-defendant is not presented on these facts. See United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009).

Second, and more significantly, Bruton is simply irrelevant in the context of nontestimonial statements. Bruton espoused a prophylactic rule designed to prevent a specific type of Confrontation Clause violation. Statements that do not implicate the Confrontation Clause, a fortiori, do not implicate Bruton. See, e.g., United States v. Clark, 717 F.3d 790, 816 (10th Cir. 2013) ("[T]he Bruton rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.") (citation and internal quotation marks omitted).

17

Our conclusion that Harvey's statements were nontestimonial therefore suffices to dispatch Dargan's <u>Bruton</u> argument as well.[*]

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

---

[*] We have reviewed the additional arguments contained in the supplemental pro se brief and find nothing of merit therein.