803 S.E.2d 888

**The STATE, Respondent,**

**v.**

**Lorenzo Bernard YOUNG, Appellant.**

**Appellate Case No. 2014-002548**
**Opinion No. 5501**

Court of Appeals of South Carolina.

Heard April 17, 2017
Filed July 19, 2017
Rehearing Denied September 21, 2017

---

12. We decide this case without oral argument pursuant to Rule 215, SCACR.

610

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Susannah Rawl Cole, and Solicitor Daniel Edward Johnson, all of Columbia, for Respondent.

HILL, J.:

After a joint trial, Lorenzo Young and Trenton Barnes were convicted by a jury of murder, kidnapping, second-degree burglary, and attempted armed robbery. On appeal, Young argues the trial court abused its discretion in (1) admitting a letter written by Barnes as a statement against penal interest, Rule 804(b)(3), SCRE; and (2) failing to grant his motion for mistrial. We find the letter was admitted in error, and the error was not cured by the trial court's instruction to disregard the letter. We conclude, however, that the error in admitting the letter and any error in failing to grant a mistrial was harmless. We therefore affirm Young's convictions and sentences.

I.

Kelly Hunnewell worked for Carolina Cafe in Columbia as a baker and cook. Hunnewell's shift started early in the morning, and she baked at a remote kitchen located at 93 Tommy Circle. The kitchen was next door to the Ale House Lounge, and both buildings were equipped with video surveillance.

According to the surveillance video and other evidence, Hunnewell arrived at the kitchen at 3:00 a.m. on July 1, 2013. It was raining hard outside, and she left the door to the kitchen propped open. At 3:40 a.m., while Hunnewell was stirring potatoes, a man wearing a red-hooded sweatshirt entered the open door, followed closely by a man wearing a gray-hooded sweatshirt. Both men had their sweatshirts pulled tightly around their faces. Each held a gun in what appeared to be a gloved hand. At the same time, a third man, wearing a dark-hooded sweatshirt, appeared at the door. The man in the red sweatshirt immediately ran up behind Hunnewell and placed his gun to her head. The man in the gray sweatshirt ran to the other side of Hunnewell, blocking any means for her escape. A brief struggle ensued, and Hunnewell attempted to fend off her assailants with a large spoon. During the struggle, both men fired their weapons. Hunnewell fell to the ground, and at 3:41 a.m., the men fled.

A neighbor who heard the gunshots and Hunnewell's screams called the police. Officer Jonathan Brayboy received the call from dispatch at 3:44 a.m., and arrived promptly to

find Hunnewell lying on the floor. It was later determined she had died almost instantly from a .40 caliber gunshot wound to her chest and neck. Police officers discovered six bullet casings at the scene—four .45 caliber GAP casings and two Smith & Wesson .40 caliber casings. Police swabbed for DNA, canvassed the neighborhood for information related to the crime, and released portions of the surveillance video to the media.

Tips began to trickle in. Mary Brown, a resident of the neighborhood where Barnes and Young lived, called the police tip line after seeing the surveillance video on the news. Brown testified that on the afternoon before the shooting, she was at a cookout also attended by two young men: one was wearing a gray-hooded jacket or hoodie, the other a red one. At the time, she did not know who the men were but later identified them to police.[1]

Donald Moore, who knew Young "from the street" and described Barnes and Troy Stevenson, Barnes' brother, as his friends, approached the police on July 2nd. In his statement, Moore informed the police that a few days before the shooting, he was present when Troy and Young were discussing a plan to rob the Ale House. He stated Young had acquired a Glock 40 and was showing it on the street. Moore stated Young wore the red-hooded sweatshirt seen on the video, and Troy often wore the gray one. Finally, Moore stated that after viewing the surveillance video, he believed Troy and Young were the shooters. At trial, Moore recanted his entire statement, testifying he had lied to police.

On July 5th, Investigators executed a search warrant at Young's house and recovered five gloves from Young's closet that later tested positive for gunshot residue, two unfired .45 caliber GAP rounds of ammunition, an empty Glock magazine, and a .40 caliber Smith & Wesson unfired round. Police searched Barnes' home pursuant to warrant the same day, recovering a "soaking wet" dark hoodie. Barnes, who was sixteen at the time, was arrested at his home, which was within walking distance of the scene. Young was arrested later

---

1. Due to a sustained objection, Brown was not permitted to testify to the actual identities of the men, just that she was able to identify them to the police.

that evening, found hiding in an upstairs closet of his cousin's home.

Latoya Barnes, Barnes' mother, testified she was home the night of the shooting and her two sons, Barnes and Troy, were there as well. According to Latoya, around 11:00 p.m. or midnight, Barnes and Young left the house together, while Troy had departed earlier with another group of friends. Latoya testified Young was wearing a red sweatshirt, Troy was wearing a dark sweatshirt, and Barnes was wearing a gray one. Troy eventually returned home with his friends, but Barnes and Young had still not returned at 2:00 or 3:00 a.m. Around that time, Latoya stated Young called and asked to speak with one of Troy's friends who was present at Latoya's home; she gave the friend the phone. Later, Latoya received another call from Young, asking for that same friend. Latoya testified she asked Young, "Where is [Barnes]?" Young replied Barnes was with him "right down the street." Latoya asked Young to tell Barnes to come home. When Barnes did not immediately return home, Latoya told Troy to go "get your brother." Troy then left the house and Latoya went to bed. Latoya testified that when she awoke at 6:00 or 7:00 in the morning, Barnes, Young, and Troy were all at her home. Shortly thereafter, someone came by and picked Young up.

At trial, the State questioned Latoya about a statement she gave to police after her sons were arrested, identifying Barnes as the person in the video wearing the gray hoodie. Latoya denied identifying Barnes. Later in the trial, the State played a portion of Latoya's recorded statement to police in which she identified Barnes as the person in the video, stating, "Yeah, I mean it was [Barnes] with the gray on. Like I said, I know my kids' build. I know them from their fingers to their toes. I know my kids."

Additionally, Latoya testified she received a letter from Barnes dated March 31, 2014, while he was in the detention center. Over Young's objection that it was inadmissible hearsay and violated *Bruton v. United States*,[2] the letter was entered into evidence. In the letter, Barnes admitted his role in the shooting and implicated Young. A handwriting expert testified the letter was written by Barnes. After an overnight

---

2.   391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

recess, the trial court instructed the jury the letter could not be used as evidence against Young. Young objected to the instruction and moved for a mistrial.

Young's girlfriend, Rolanda Coleman, testified that at the time of the shooting, she and Young were living together with their infant daughter. Speaking with police a week after the shooting, Coleman stated Young had acquired a gun a month or two before the incident. Coleman testified that on the night of the shooting, she was at her home and Young was at Latoya's home. According to her statement, Coleman received a call from Young the next morning asking for a ride home. Young's mother picked him up from Barnes' home, and when he returned, Young had a gun that he wrapped in a shirt and placed in the baby's crib.[3] Young described the gun to Coleman as a "45." Coleman and Young then went to work; when they returned home, the gun was gone. After Young and his mother saw the surveillance video of the shooting on the news, Coleman overheard Young's mother tell him to get rid of the gun. Coleman also testified Barnes often wore a gray-hooded sweatshirt, and she had previously seen Barnes with a gun. Upon seeing the video of the shooting, Coleman identified Barnes as the person wearing the gray sweatshirt. She testified she could not identify the person in the red sweatshirt. Coleman admitted that at the time of trial, she had pending charges for burglary in the first degree but claimed the State had made no promises to her in exchange for her testimony.[4]

Evidence from Young's cell phone was also admitted. The call log corroborated Latoya's and Coleman's testimony regarding calls made by Young on the evening and morning of the shooting. The phone also contained several cached photographs from internet searches beginning the day of the shooting, including portions of the video and still pictures of the man in the red sweatshirt from the police media release. Investigators also discovered a video on the cell phone recorded five days before the shooting. This video, which was published for the jury, depicted Young in a gray sweatshirt

3. Coleman testified the baby was staying with her grandmother at the time.

4. Young and Coleman were codefendants for the burglary charges, but the trial court did not permit reference about Young being charged.

displaying a gun—which he called a "Glock 4-5"—for the camera.

Next, the State presented the testimony of three jailhouse informants. Alfred Dominique Wright testified Young approached him in the jail's law library asking for help with his case. According to Wright, Young told him what happened the night of the shooting, implicating both himself and two brothers nicknamed "Trigg and Trap." Wright testified he later learned Trigg and Trap were Troy and Barnes.

Michael Peterson testified that while he and Young were housed in the same unit of the detention center, Young approached him to talk about his case. Peterson testified Young described the shooting incident, implicating himself and another person Young called "his little homey." Peterson further testified that later, while in the shower, he overheard a nervous-sounding Young "hollering back and forth" with Troy about evidence collected in the case, explaining that all the police had recovered were shell casings.

Michael Schaefer testified he knew Young because they were housed in the same dorm in jail. Schaefer testified Young told him about the shooting, implicating himself and "Trap and Trigg." According to Schaefer, on one occasion, Young told him, "I shouldn't have shot that bitch."

Finally, the State presented testimony from a firearms and tool marks examination expert and a DNA expert. The firearms expert testified GAP .45 bullets, like the ones found at the scene and at Young's house, were typically used by law enforcement rather than civilians and could only be fired by a Glock-manufactured gun. The DNA expert testified she could not exclude either Barnes or Young from a DNA sample recovered from the spoon Hunnewell used to hit her assailants. However, on cross-examination, the expert admitted one-third of the world population could not be excluded as contributors. Neither the guns nor the red and gray hoodies were ever found.

Neither Barnes nor Young presented evidence, and instead challenged the State's proof. At the close of trial, the trial court charged "hand of one, hand of all" liability in addition to murder, kidnapping, second-degree burglary, and attempted armed robbery. After deliberating around three hours, the

jury found Barnes and Young guilty of all counts. Young received consecutive sentences of life without the possibility of parole for murder, twenty years for attempted armed robbery, and fifteen years for burglary. Barnes was sentenced consecutively to fifty years for murder, twenty years for attempted armed robbery, and fifteen years for burglary.

## II.

█ Young argues the trial court erred in admitting Barnes' letter to his mother as a statement against penal interest pursuant to Rule 804(b)(3), SCRE, which provides:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

*Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), is the starting point for considering admissibility of statements against penal interest. The case involved lengthy statements made by Williamson's accomplice, Harris, which had been admitted as evidence against Williamson in his separate trial. *Id.* at 596-98, 114 S.Ct. 2431. The Court began by holding that the term "statement" as used in the text of Federal Rule of Evidence 804(b)(3) refers to a "single declaration or remark." *Id.* at 599-600, 114 S.Ct. 2431. Rejecting the broader construction that a "statement" can encompass a narrative or extended declaration, the Court reasoned:

Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion

> simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*Id. Williamson* recognized that Rule 804(b)(3) is an attempt to reconcile two creeds of witness reliability courts have long sustained. The first is the principle upon which the rule was founded: that people do not often falsely accuse themselves or say things that harm their interests, so such statements are naturally credible. The second is the belief that an accomplice's statement that accuses another is inherently unreliable. *See, e.g., Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). *Williamson* confronts the issue of what courts should do when the same person makes both types of statements. Wigmore believed that because the declarant was speaking while in a trustworthy state of mind indicating his "sincerity and accuracy," then whatever a declarant says when "under that influence" should be admitted. 5 J. Wigmore, *Evidence* § 1465, p. 339 (J. Chadbourn rev. 1974). *Williamson* avoided Wigmore's hypnosis-like view, which seems designed more for a circus tent than a tribunal, and crafted an approach that more realistically accounts for human nature: that when speaking of their criminal activity, people often speak out of both sides of their mouth. *Williamson* instructs how to apply Rule 804(b)(3) when a remark considered so reliable as to be naturally credible (i.e., no one would say it unless it was true) is coupled with one long held to be conspicuously unreliable (i.e., no one who says that can be trusted):

> In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else.

512 U.S. at 600–01, 114 S.Ct. 2431.

■ Our supreme court adopted the *Williamson* approach in *State v. Fuller,* 337 S.C. 236, 244–45, 523 S.E.2d 168, 172

(1999). We interpret the rule allowing statements against penal interest stringently. *Fuller* emphasized the "strict requirements" of the rule. *Id.* at 245, 523 S.E.2d at 172. *State v. Holmes* reaffirmed *Fuller* and stressed the rule is to be applied "very narrowly to only those portions of a hearsay statement which are plainly self-inculpatory." 342 S.C. 113, 117, 536 S.E.2d 671, 673 (2000).

Rule 804(b)(3), SCRE, requires the trial judge to view the disputed evidence in light of the surrounding circumstances and discern whether each particular remark is plainly self-inculpatory. This entails a searching examination of both content and context.

Viewing Barnes' letter through this lens, we conclude it is replete with statements that do not directly incriminate him, but instead seek to curry favor with his mother or shift blame to Young. Barnes assures his mother at least four times that his brother Troy's involvement was minimal (e.g., "Troy [ ] had nothing to do with it. I should of told them that Troy really came down there to get me.... [Troy] said hell no don't go with [that] man.... I looked back and seen Troy waving his hand telling me to come back."). Even the State in its closing acknowledged Barnes' underlying motivations in writing the letter, conceding he was "maybe trying [to] protect his brother" and "minimizing his own role." The focus on downplaying Troy's role is significant, for in an earlier recorded statement that the trial court excluded, Barnes had told police that he—and not Troy—had been the "lookout" for the two others who had gone inside the bakery. This underscores the notorious unreliability common to statements implicating accomplices and why they by definition almost always fall outside the tight boundaries of Rule 804(b)(3).

■ Barnes also paints himself in the letter as a reluctant participant manipulated by Young into the robbery and murder. He repeatedly describes Young as the organizer and instigator, offering a "mere presence" defense for himself. Once a declarant begins shifting blame to another, there is a corresponding shift away from the admissibility requirements of the rule. *See Williamson*, 512 U.S. at 603, 114 S.Ct. 2431; *McCormick on Evidence*, § 319 at 534 (7th ed. 2013). Like the declarant in *Holmes*, Barnes "repeatedly depicts himself as

[being] caught up in the crime." 342 S.C. at 117 n.3, 536 S.E.2d at 673 n.3. Barnes wrote he was planning on spending the evening with his girlfriend, until bowing to Young's relentless pressure to accompany him on his planned robbery of the Ale House. When they found the Ale House closed, Barnes wrote "so I said come on let's go back to my house then [Young] said you see that lady over there.... " Barnes describes the fatal moment as orchestrated entirely by Young: "I got scared ma I didn't want to do it ... I should never listen to [Young]." These blame-spreading remarks should have not been presented to the jury. *Id.* (" 'Confessions' which shift blame to co-conspirators cannot reasonably be viewed as self-inculpatory."); *see State v. Dinkins*, 339 S.C. 597, 602, 529 S.E.2d 557, 559 (Ct. App. 2000) (attempts to absolve blame and other self-serving statements do not qualify as statements against penal interest).

■ Placing Barnes' statements in context does not translate into admitting the entire narrative to demonstrate the backdrop. There is no *res gestae* rider to Rule 804(b)(3). Nor can we accept the State's position that the entire letter, except the references to Troy, is against Barnes' penal interest. To be sure, "a statement is not *per se* inadmissible simply because the declarant names another person." *Fuller*, 337 S.C. at 245, 523 S.E.2d at 172. Nevertheless, we have never found a statement in which a declarant implicates—rather than merely names—another admissible under Rule 804(b)(3). The rule only grants admission of statements against the declarant's penal interest. Statements that are against the penal interest of an accomplice do not qualify for the simple fact that the accomplice is not the declarant. To explain proper application of the rule, the *Williamson* Court furnished an illuminating example:

> [O]ther parts of his confession, especially the parts that implicated Williamson, did little to subject Harris himself to criminal liability. A reasonable person in Harris' position might even think that implicating someone else would decrease his practical exposure to criminal liability, at least so far as sentencing goes. Small fish in a big conspiracy often get shorter sentences than people who are running the whole show, especially if the small fish are willing to help the authorities catch the big ones.

512 U.S. at 604, 114 S.Ct. 2431 (citations omitted). The Court dismissed the position that "an entire narrative, including non-self-inculpatory parts (but excluding the clearly self-serving parts ...), may be admissible if it is in the aggregate self-inculpatory." *Id.* at 601, 114 S.Ct. 2431. *See generally Weinstein's Federal Evidence*, § 804.06 (4)(d) (2d ed. 2017) ("[A] statement which shifts a greater share of the blame to another person (self-serving) or which simply adds the name of a partner in the crime (neutral) should be excluded even when closely connected to a statement that assigns criminality to the declarant.").

The State also mischaracterizes *Williamson* as drawing a distinction between statements made by Harris regarding the same criminal activity undertaken by both Harris and Williamson and statements by Harris about Williamson's "separate criminal activity." *Williamson* does not say this. In his narrative confessions, Harris implicated both himself and Williamson in the same drug conspiracy; the opinion depicts no unilateral "separate" criminal conduct by Williamson. *Williamson*, 512 U.S. at 596–97, 114 S.Ct. 2431. The fact that Williamson's exposure to criminal prosecution was "separate" from Harris' is precisely what removed declarant Harris' statements implicating his accomplice Williamson from the rule: he had made a statement not against his own penal interest, but against the interest of Williamson. *Id.* at 604, 114 S.Ct. 2431. As *Williamson* noted:

> The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.

*Id.* at 603–04, 114 S.Ct. 2431; *see also McCormick on Evidence*, § 319 at 533 ("The result is that only the specific parts of the narrative that inculpate qualify.").

Nor are we persuaded by the State's reliance on *United States v. Dargan*, 738 F.3d 643 (4th Cir. 2013). Dargan was tried separately for a robbery committed with two others. *Id.* at 645–46. The Fourth Circuit affirmed admission of a statement one of Dargan's co-defendants, Harvey, had made to a cellmate confessing to the crime and mentioning his two

accomplices without identifying them other than to say they were incarcerated in the same facility. *Id.* at 649–50. The court found the statements were against the declarant's penal interest and satisfied Rule 804(b)(3) because they demonstrated an insider's knowledge of the crime and exposed him to conspiracy liability. *Id.*

We are not convinced *Dargan* is compatible with *Williamson*. There is no "insider's knowledge" exception to the hearsay rule. *Dargan* and other courts that see such a mirage, *see, e.g., United States v. Volpendesto,* 746 F.3d 273, 288 (7th Cir. 2014), may be misreading *Williamson*'s reference to how *otherwise neutral* statements may, depending on context, be self-inculpatory if they "give the police significant details about the crime." *Williamson,* 512 U.S. at 603, 114 S.Ct. 2431. But this does not mean, as Justice Scalia's solo concurrence implies, that statements revealing inside knowledge of a crime are automatically admissible even if they implicate others besides the declarant. *Id.* at 605–07, 114 S.Ct. 2431.

We also find it difficult to see how any of Harvey's remarks in *Dargan*, other than the admission of his own involvement, were individually self-inculpatory. One who says "I killed X and did it with Y" would certainly be subject to conspiracy liability, and the statement would also be admissible against the declarant in his separate trial as a statement of a party-opponent. But almost *any* remark implicating both the declarant and an accomplice in a joint crime also incriminates the declarant in a conspiracy, and to use such logic to meet 804(b)(3) would be an end run around *Williamson* as well as render that decision unintelligible, as many of the statements the Court described as non-self-inculpatory to Harris surely connected him to a conspiracy with Williamson.[5]

---

5. Rule 801(d)(2)(E), SCRE, classifies "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" as not hearsay. But remarks made by a co-conspirator once the conspiracy has ended or that do not advance the conspiracy's aims do not enjoy the same aura of reliability. Consequently, they are treated like any other hearsay, mirroring the treatment Rule 804(b)(3) accords the non-self-inculpatory statements of accomplices. *See State v. Sims,* 387 S.C. 557, 566, 694 S.E.2d 9, 14 (2010) (finding co-conspirator statements that do not further the conspiracy but simply "spill the beans" inadmissible).

Significantly, Federal Rule of Evidence 804(b)(3) was amended in 2010 to require that a statement against penal interest be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Our Rule 804(b)(3) only requires corroboration when the statement is offered to exculpate the accused. Because this protective layer of corroboration is not extended to statements offered by the State to inculpate the accused, the need to rigorously restrict admission to plainly self-inculpatory remarks in such circumstances is even more urgent. Confining the statement against interest exception to such declarations is consistent with the text of the rule and the wariness with which our courts have treated this strand of hearsay, which was altogether barred from admission in criminal trials until *State v. Doctor*, 306 S.C. 527, 529–30, 413 S.E.2d 36, 38 (1992), and the adoption of the South Carolina Rules of Evidence in 1995. Before that, the common law only tolerated it in civil cases, and then only if the declarant was dead. *See, e.g., Gilchrist v. Martin*, 8 S.C. Eq. 492 (1831).

We find the trial court erred in admitting Barnes' letter without conducting the careful examination required by Rule 804(b)(3). The portions of the letter that did not plainly inculpate Barnes were rank hearsay inadmissible against Young.

## III.

■ We next consider whether the trial court cured the error by instructing the jury the next morning to not consider the letter against Young. We start by presuming the cure worked, for we also presume juries follow their instructions. *See State v. Grovenstein*, 335 S.C. 347, 353, 517 S.E.2d 216, 219 (1999); *see also Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (noting "the almost invariable assumption of the law that jurors follow their instructions"). This presumption has long been assailed, most famously by Justice Jackson's disdainful appraisal of "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, [which] all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J.,

concurring) (citation omitted). Others have defended jurors' ability to perform their duties conscientiously. *See United States v. Mazzone*, 782 F.2d 757, 764 (7th Cir. 1986) ("We are not quite so naive as to believe that telling jurors not to think about something will cause them to forget it, but we trust juries to behave responsibly and to put aside as considerations bearing on their judgment matters that the judge tells them to put aside."); *see also* Sklansky, *Evidentiary Instructions and the Jury as Other*, 65 Stan. L. Rev. 407, 424-28 (2013) (reviewing thirty-three empirical studies of the effect of limiting instructions on mock juries and contending instructions can be effective if prudently delivered).

██ Limiting instructions are deemed to cure error unless "it is probable that, notwithstanding the instruction, the accused was prejudiced." *State v. Smith*, 290 S.C. 393, 395, 350 S.E.2d 923, 924 (1986). The instruction given here was well-crafted, as far as limiting instructions go, which is not far amidst the dense gravity of a *Bruton*-like error.[6] *Bruton* held the admission, in a joint trial, of a nontestifying defendant's confession implicating a co-defendant violated the Confrontation Clause. 391 U.S. at 126, 88 S.Ct. 1620. The Court then took the remarkable step of adopting a *per se* rule that the violation could not be cured by a limiting instruction. *Id.* at 135–36, 88 S.Ct. 1620. The Court found:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a code-

---

**6.** We leave for another day the issue of what impact, if any, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) has on *Bruton*. Many federal circuits have found that because *Crawford* limited the reach of the Confrontation Clause to testimonial statements, *Bruton* no longer applies to the admission of non-testimonial statements in a joint trial. *See Dargan, supra; United States v. Vasquez*, 766 F.3d 373, 378–79 (5th Cir. 2014). Our focus is solely whether, on the record before us, the presumption that curative instructions work can, in a joint trial, withstand the admission of an out-of-court statement by a nontestifying co-defendant that violates the hearsay rule. Rules 801–805, SCRE.

fendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. *Id.* (citations omitted).

Relying on this same language, our supreme court recently reaffirmed that a limiting instruction cannot fix a *Bruton* violation. *State v. McDonald*, 412 S.C. 133, 142, 771 S.E.2d 840, 844 (2015). We perceive no practical difference between *Bruton*, *McDonald*, and the wrongful admission of Barnes' letter against Young that would justify a different result. We do not believe the limiting instruction given here in a joint trial magically gains potency by labeling the error it was designed to target as inadmissible hearsay rather than lack of confrontation. The concepts are close cousins. *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) ("[T]he Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots."). Nor can we sensibly say the magnitude of prejudice varies with whether the tainted confession was testimonial or not. It was an out-of-court statement that came in as evidence against the accused without the benefit of cross-examination, and the limiting instruction could not take it out.

## IV.

Having decided the error in admitting Barnes' hearsay statements was not cured, we must address whether it was nevertheless harmless. The improper admission of hearsay is harmless when it could not have reasonably affected the result of the trial. *State v. Brewer*, 411 S.C. 401, 408–09, 768 S.E.2d 656, 660 (2015). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985). For example, "[i]mproperly admitted hearsay which is merely cumulative to other evidence may be viewed as harmless." *State v. Jennings*, 394 S.C. 473, 478, 716 S.E.2d 91, 93–94 (2011) (citing *State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978)). If it appears beyond a reasonable doubt that the error did not contribute to the verdict, then the error may be deemed harmless. *State v. Tapp*, 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012).

While we have not based the error here on *Bruton* or other constitutional grounds, the analysis for ascertaining the harmfulness of a *Bruton* error remains useful, and is not functionally different from the test for trial errors outlined above. The violation of the Sixth Amendment right to confrontation is not *per se* reversible error. In *McDonald* and *State v. Henson*, 407 S.C. 154, 167, 754 S.E.2d 508, 515 (2014), our supreme court quoted *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972): "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." Whether a *Bruton* error is harmless depends upon numerous factors including "the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *State v. Jenkins*, 322 S.C. 360, 364–65, 474 S.E.2d 812, 815 (Ct. App. 1996).

We recognize it may seem counter-intuitive to find the hearsay error so prejudiced Young that no curative instruction could save it, yet also find the error harmless beyond a reasonable doubt. We are also mindful that a confession (sometimes called "the Queen of proofs") is among the most explosive and incriminating of evidence, and often profoundly impacts the jury. But it must be remembered that the jury also had before it three separate confessions made by Young himself rather than his accomplice. Although these statements were recounted by fellow prisoners facing serious pending charges, and whose motives and recall were questioned extensively, it was up to the jury to gauge credibility. It is probable the collective impact of this testimony was more damaging to Young than Barnes' letter, which after all was written by a minor in lockup to his mother. *See Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (finding admission of two co-defendants' confessions in violation of *Bruton* harmless when Harrington also confessed and evidence of his guilt was overwhelming; "Our judgment must be

based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury."). The statements attributed to Young by his fellow inmates were largely consistent with each other, and corroborated other key pieces of the State's case. *See Schneble*, 405 U.S. at 431, 92 S.Ct. 1056 (finding a *Bruton* violation to be harmless error when the "details of petitioner's [confession] were internally consistent, were corroborated by other objective evidence, and were not contradicted by any other evidence in the case"); *accord McDonald*, 412 S.C. at 143–44, 771 S.E.2d at 845. We note *McDonald* found a limiting instruction wanting in light of *Bruton*, yet still found the *Bruton* error harmless.[7] 412 S.C. at 142–44, 771 S.E.2d at 844–45.

Although the decision dealt with a defendant's confession improperly admitted against him in his separate trial, Justice Kennedy's concurrence in *Arizona v. Fulminante*, 499 U.S. 279, 313, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), emphasized that a court

> conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact. . . . If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence.

We have such a videotape here. Three witnesses, including his mother, identified Barnes as one of the people on the video shooting at Hunnewell. Numerous witnesses placed Young together with Barnes at Barnes' mother's house shortly before and after the crime occurred, wearing a red sweatshirt like that seen on the video. This house was within walking distance of the scene. Donald Moore stated that Young had discussed his planned robbery of the Ale House and that Young had a Glock .40. Three witnesses related confessions by Young that

---

7. We understand that in *Henson* our supreme court found a *Bruton* error not to be harmless. *See Henson*, 407 S.C. at 167, 754 S.E.2d at 515. There, however, the evidence of guilt was not overwhelming. Unlike the situation here, there was no physical evidence linking the defendant to the crime and he had not confessed to third parties. *See id.*

corroborated details from the video. Portions of the video were found on his cell phone, along with a depiction of him brandishing what he described as a Glock .45. Shell casings from the scene matched the make and type as those found at Young's home. The gloves recovered from Young's home bore gunshot residue. Young's girlfriend observed him hiding a gun he described as a .45 when he arrived home a few hours after the murder, and she also heard his mother later warn him to get rid of the gun.

We therefore find it clear beyond a reasonable doubt that a rational jury would have found Young guilty absent the error.[8] *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). To be sure, there are instances when the improper hearsay heard by the jury is so prominent that "[t]he reverberating clang of those accusatory words would drown all weaker sounds." *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (Cardozo, J.). But here there was a deafening drumbeat of substantial testimonial and physical evidence far more resonant than Barnes' letter.

█ We do not make this finding lightly, but in keeping with the view that "[t]he harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citation omitted); *cf.* Murray, *A Contextual Approach to Harmless Error Review*, 130 Harv. L. Rev. 1791 (2017) (noting "some degree of procedural error is virtually inevitable in all but the most straightforward of criminal trials," but advocating reform of harmless error doctrine to account more for the nature of the right infringed by the trial error rather than its effect on result).

---

8. In light of this disposition, we find that if any error occurred in denying Young's motion for a mistrial, it was also harmless. *See State v. Howard*, 296 S.C. 481, 485, 374 S.E.2d 284, 286 (1988).

We remain concerned—not to mention perplexed—by the State's use of evidence the Supreme Court forbade a generation ago in *Williamson*, and in a manner condemned a generation before that in *Bruton*. We echo Justice Kittredge's reminder of the "cautionary warning from almost three decades ago" that the State should seek the expediency of joint trials only after considering the often insoluble evidentiary problems they pose. *McDonald*, 412 S.C. at 144 n.4, 771 S.E.2d at 845 n.4. These problems, as common as they are elementary, appear to have escaped the State's attention here. Although we have found Young's trial fundamentally fair, the State's decision to jointly try him with Barnes needlessly jeopardized that fairness.

## V.

Because any error in his trial was harmless beyond a reasonable doubt, Young's convictions are affirmed.

**AFFIRMED.**

GEATHERS and MCDONALD, JJ., concur.